ELIAS C. BENEDICT, JAMES H. BENEDICT and FREDERICK H. BENEDICT, partners, trading as E. C. BENEDICT & Co., ELIAS C. BENEDICT, individually, and ANTHONY N. BRADY,

v.

COLUMBUS CONSTRUCTION COMPANY, CHARLES E. HEQUEM-BOURG, CHARLES T. YERKES, WARREN F. FURBECK, SIDNEY A. KENT, GEORGE T. YUILLE, and the INDI-ANA NATURAL GAS AND OIL COMPANY.

1. Shareholders in a corporation cannot extinguish its charter or dissolve it, and a court of equity is without power to accomplish a similar result at their instance. In the absence of statutory provisions, the franchises can be declared forfeited and extinguished only at the suit of the state, in an appropriate proceeding at law.

2. If shareholders in a corporation disapprove of the company's management, conducted without fraud or gross abuse of trust, or consider their speculation to be a bad one, their remedy is to elect new officers or sell their shares and withdraw.

3. Where the question is one of mere discretion in the management of corporate business by directors, or of doubtful event in the undertaking in which the corporation has embarked, remedy cannot be had by application to a court of equity.

4. Where, however, it plainly appears that the object for which the company was formed is impossible of attainment, it becomes the duty of the company's agents to put an end to its operations and wind up its affairs, and should they, even though supported by a majority of the shareholders, pursue operations which *must* eventually be ruinous, any shareholder feeling aggrieved will, upon plain equitable principle, be entitled to the assistance of this court by decree compelling the directors to wind up the company's business and distribute the assets among those who are entitled to them, unless they can be lawfully used for other business purposes allowed by the charter.

5. Until the national congress regulates the transportation of natural gas from state to state, it being admittedly a dangerous commodity, the several states may make reasonable regulations for the protection of the life and health of its citizens against it, and such regulations, when not directed against interstate commerce, but only incidentally and necessarily affecting it, will be upheld as valid.

6. But where the state steps beyond the legitimate domain of police regulation, and under its guise, or otherwise, seeks, by its legislation, to restrict interstate commerce, such legislation becomes invalid.

7. The United States supreme court, though pronouncing the fundamental law to be that a burden cannot be imposed by the states upon interstate commerce which will directly and substantially interfere with its freedom, has refused to attempt an exact definition of the line to which legislation by the several states may incidentally affect interstate commerce.

8. State legislation which, in effect, prevents the transportation of natural gas beyond the territorial limits of Indiana, and is not supportable in reason as a police regulation, within the course of decision by the United States supreme court, is invalid as restrictive of the freedom of interstate commerce.

9. Such legislation being urged as proof that the object of a corporation, which is to transport natural gas from Indiana to Chicago, is unattainable, it is held that it has not been made to *plainly appear* that the object of the corporation is unattainable, and that, therefore, equity will not interfere by preliminary injunction to stay the further operations of the company.

10. If the provisions of a statute are so interwoven as to be incapable of distinct separation, or are of such character that it cannot be said that the legislature intended that the valid parts shall be enforced if the other parts fail, the entire law must be held to be invalid.

On order to show cause why injunction shall not issue. Heard upon bill, answer, affidavits and exhibits.

Benedict v. Columbus Construction Co.

Mr. *Edward A. Day* and Mr. *Thomas N. McCarter*, for the
·complainants.

Mr. *James B. Vredenburgh* and Mr. *Samuel H. Grey*, for the
·defendants.

THE CHANCELLOR.

The complainants are the owners of seven thousand nine hun-
-dred and fourteen shares of the capital stock of the Columbus
Construction Company, a corporation organized under the gen-
·eral corporation law of this state and its supplements.   *Rev. p.*
*175.*

The desired end of the suit, shortly stated, is to obtain a
decree that the real object for which the Columbus Construction
Company was organized is to profitably construct a pipe con-
duit for natural gas from the gas fields in Indiana to Chicago,
and that as, under the contract it has made to that end, the pay-
ment it will receive depends for value upon the success of the
conduit in transporting a sufficient quantity of gas to yield a
profit, and that success is impossible under an existing statute of
Indiana, the object for which the company was formed is unat-
tainable, and the company must be wound up.   Pending the
main and ultimate relief, a preliminary injunction is asked, to
restrain the corporation from the expenditure of further moneys
in effort to completely execute the contract aforesaid, the execu-
tion of which, they insist, if at all possible, must, under any
·circumstances, be productive of irreparable loss; and also to
·restrain it from levying and collecting further assessments upon
stock not fully paid for, in excess of that which will be sufficient
·to pay the debts of the company and the expenses incident to its
·winding up.

The pertinent facts extracted from bill and answer, and proofs
:annexed to them, may be stated as follows :

The Columbus Construction Company was organized in Oc-
·tober, 1889, with an authorized capital of $150,000, $10,000 of
·which was paid in at the organization.   The declared objects for
which the company was formed were :

"To make contracts for the construction of, and to construct conduits, works or buildings of any kind or character in New Jersey and other states aforesaid, [Indiana, Illinois, Ohio, Kentucky, Missouri and New York], and to acquire, purchase, hold, sell and dispose of any kind of property, real, personal or mixed, which may be necessary or desirable for the business of the company."

During the same year the Indiana Natural Gas and Oil Company was organized under the laws of Indiana, with a capital stock of $1,500,000, for the purpose of purchasing and leasing natural gas fields through the state, drilling wells for natural gas and supplying such gas for consumption as fuel.

In June, 1890, these corporations entered into a contract with each other, in which, among other things, the Columbus Construction Company agreed to purchase and acquire a right of way upon which a pipe line might be constructed and maintained, extending from gas wells and territory in Indiana through several counties of Indiana, into and through the State of Illinois to the city of Chicago, and to build, in the right of way, an iron pipe line to be connected with the gas wells, and to supply and furnish suitable pumping machinery and other artificial devices for transporting gas through the pipe line, and erect them at suitable points in Indiana upon the pipe line; the pipe line and devices aforesaid to be of suitable capacity to transport from the gas wells of Indiana to Chicago, and there deliver not less than five million cubic feet of gas daily, and, upon the completion of the pipe line, to transfer it to the Indiana Natural Gas and Oil Company, together with the natural gas, real estate and wells, right of way and pumping and other machinery; and the Indiana Natural Gas and Oil Company, upon its part, agreed to issue and deliver to the Columbus Construction Company, in payment, its entire capital stock and its corporate bonds, secured by mortgage upon said gas plant and system, to the amount of $4,000,000 out of a total issue of $5,000,000.

In the same month in which this contract was entered into, the Columbus Construction Company duly increased its capital stock to $2,500,000, making the total number of its shares twenty-five thousand.

After the contract was entered into, the construction company proceeded to acquire a right of way and lay a pipe line, as the contract contemplated, from the natural gas fields in Indiana to the city of Chicago, in the State of Illinois.

The execution of the contract has at this time so far progressed that, according to the answer, the construction company has acquired a right of way for about one hundred and thirty miles out of a necessary one hundred and thirty-six miles, and has laid one hundred miles of main line piping and forty miles of field connecting piping, and has purchased and distributed, for use along its right of way, about thirty additional miles of piping, and has also contracted to buy all the remaining piping, and all pumping machines contemplated by the contract. It has expended thus far, in performance of the contract, about $1,600,000.

The possible business of transporting the natural gas of Indiana out of that state had, before this contract was entered into, been deemed by the legislature of Indiana to be inimical to the interests of the state, and, in consequence, a law, absolutely prohibitory thereof, was enacted in March, 1889. That act, known in this litigation as the act of March 9th, 1889, provided that it should be unlawful for any corporation to pipe or conduct natural gas from any point within the State of Indiana to any point or place without that state, and that any corporation then or thereafter incorporated for the purpose of mining for natural gas and furnishing the same to patrons &c., that should have entered upon and acquired by appropriation, conveyance or condemnation, real estate for pipe lines or for any other purpose, and should permit any gas to be conveyed or carried through its pipe lines to any place outside of Indiana, or for the purpose of being used without that state, " shall forfeit all right, title and interest in and to all real estate so appropriated, conveyed or condemned, and the pipes laid thereunder, and the same shall revert to and become the property of the persons or corporation, their heirs, successors or assigns, who owned the same at the time of such appropriation, conveyance or condemnation," &c.

This law was declared to be invalid, by the supreme court of Indiana, in *The State, ex rel. Corwin,* v. *Indiana and Ohio Oil, Gas and Mining Co., 120 Ind. 575,* because it restricted interstate commerce.

It was while this Corwin suit was pending, and before the prohibitory law referred to was declared to be invalid, that the scheme contemplated by the contract between the Columbus Construction Company and the Indiana Natural Gas and Oil Company was assented to by the stockholders of the construction company, including the complainants, and put in operation.

The prosecution of the contract just referred to engendered hostility to the enterprise it contemplated, upon the part of citizens of Indiana, particularly those who had invested in natural gas industries in that state. This hostility resulted in the passage of another law by the legislature of Indiana, without the approval of the governor, on the 4th of March, 1891, which is entitled "An act to regulate the mode of procuring, transporting and using natural gas, and declaring an emergency." It proceeds, in its first, second and third sections, as follows:

"*Section 1.* Be it enacted by the General Assembly of the State of Indiana, That any person or persons, firm, company or corporation engaged in drilling for, piping, transporting, using or selling natural gas, may transport or conduct the same through sound rock or cast iron casings and pipes tested to at least four hundred pounds pressure to the square inch; *provided,* such gas shall not be transported through pipes at a pressure exceeding three hundred pounds per square inch, nor otherwise than by the natural pressure of the gas flowing from the well.

"*Section 2.* It is hereby declared to be unlawful for any person or persons, firm, company or corporation to use any device for pumping, or any other artificial process or appliance for the purpose, or that shall have the effect of increasing the natural flow of natural gas from any well, or of increasing or maintaining the flow of natural gas through the pipes used for conveying and transporting the same.

"*Section 3.* Any person or persons, firm, company or corporation violating any of the provisions of this act shall be fined in any sum not less than one thousand dollars or more than ten thousand dollars, and may be enjoined from conveying and transporting natural gas through pipes otherwise than in this act provided; *provided,* that nothing in this section shall operate to prevent the use of nitro glycerine or other explosives for shooting any well or wells from which the gas is procured."

The fourth and last section of the act declares an emergency, the effect of which was that the act took effect immediately upon its passage.

After the enactment of this statute, one Egbert Jamieson, who was a stockholder in the Indiana Natural Gas and Oil Company, brought suit in the circuit court of Porter county, in the State of Indiana, against the company in which he was a stockholder and the Columbus Construction Company.

In his complaint, in that suit, he alleged the incorporation of the defendant companies and the contract between them, and that work was being done under that contract, and continued in this language:

"And that by reason of the distance and natural low pressure at which the gas flows from the wells in the Indiana fields, including those to be furnished under said contract, which does not exceed, to wit, three hundred and twenty-five pounds to the square inch, it is, and always will be, impossible to transport such gas to said city of Chicago, and there deliver it for use in quantities and with a pressure sufficient to make it commercially available and profitable, unless the same is transported through the said pipe line at a pressure greatly exceeding the natural flow and pressure of the gas from said well, and in excess of three hundred pounds to the square inch, which said additional pressure can only be obtained and maintained by the use of pumping machines and other artificial devices, apparatus and appliances such as the defendant the Columbus Construction Company has undertaken to furnish and erect in connection with said pipe line and wells in and by said contract, and which said pumping machines and other artificial devices, in order to be used to any advantage, must be erected and used upon the said pipe line and within the territorial limits and jurisdiction of the State of Indiana.

" Plaintiff further avers that the said defendant the Indiana Natural Gas and Oil Company, upon the completion of said contract and delivery to it of said natural gas plant and system, will have no other property or assets than such natural gas plant and system, and no means whatever of paying either the principal or interest of said bonds which are to be issued to said Columbus Construction Company therefor, or of redeeming its capital stock, except the said natural gas plant and system, and the revenues, tolls, income and profits to be earned thereby in the transportation and sale of natural gas in the city of Chicago, and that the sole value of its stock will depend upon the right and ability of said defendant to engage in and carry on, by means of its said natural gas plant and system, the business of transporting its natural gas to Chicago and there selling the same; that its said natural gas plant and system, constructed upon the plan and for the purpose provided by said contract, cannot be put to any other commercially profitable use than that of transporting natural gas to Chicago, and can only be used to advantage and profit by the

.·use as aforesaid of said pumping machines and other artificial devices, so that if said defendant the Indiana Natural Gas and Oil Company, by reason of the statute aforesaid, is prohibited from transporting said gas through said pipe line at more than the natural flow and pressure, or at a pressure in excess of three hundred pounds to the square inch, or from using any artificial device to increase or maintain the natural flow of the gas, the natural gas property and plant contracted to be furnished and delivered to the defendant as aforesaid will be of no value for the purpose of such plant, and of little or no value for any purpose to said defendant, and the stock and bonds of the defendant will be wasted and the said company deprived of all means of effecting the objects and purposes of its incorporation and be rendered entirely insolvent.

"Plaintiff further avers and charges that the statute aforesaid has made it unlawful for the defendant, or any other person in the State of Indiana, to transport natural gas through said pipe line at a pressure exceeding three hundred pounds to the square inch, or the natural flow and pressure of such gas, or to use in such transportation any artificial device for the purpose, or which shall have the effect, of increasing or maintaining the natural flow and pressure of such gas."

He further averred that he demanded an abandonment of the enterprise and contract, and that such demand was refused.

He asked that the contract be declared "null and void" and cancelled, and that the Indiana Natural Gas and Oil Company be enjoined from further proceeding in the execution of the contract, and from issuing and delivering to the Columbus Construction Company the stock and bonds which, upon the execution of the contract, it would, by the contract, be required to give, and from violating the statute of March 4th, 1891.

The defendant companies answered this complaint by admitting its allegations concerning their incorporation and the contract between them, and by affirming that they intended to transport natural gas through pipes, tested to stand a pressure of one thousand pounds to the square inch, at a pressure not exceeding six hundred pounds to the square inch, which pressure would be produced by artificial means, and that such conduit would be entirely safe and in no way injurious to the people of the State of Indiana nor to the rights of private property; that their proposed action would be but a reasonable exercise of their rights of property in transporting gas to Chicago for sale, and that their property was acquired and scheme entered into prior to the passage of the act of March 4th, 1891.

Benedict v. Columbus Construction Co.

The plaintiff demurred to this answer, and the circuit court of Porter county overruled his demurrer.

The case was then carried by the plaintiff to the supreme court of Indiana, where the judgment of the circuit court was reversed by a divided court.

The opinion of the court (*12 Lawy. Ann. Rep. 652*) was delivered by Judge Elliott, who expressly defined the limits of the court's consideration and conclusions in this language: "We adjudge that the complaint is to be construed as charging that the contract of the corporation of which the appellant is a member, with the construction company, is incapable of performance, because it requires a violation of the act of March 4th, 1891, in this, that it provides for and requires that natural gas be transported in pipes at a greater pressure than the natural pressure, or at an artificial pressure exceeding three hundred pounds to the square inch. We may further affirm it to be our judgment upon this phase of the case, that there is here no question as to the right of a stockholder to maintain such a suit as this, for no such question is presented by the briefs or arguments, and we say, still further, that the essential and controlling question presented by the ruling upon the complaint is, whether a contract, which cannot possibly be performed without a direct violation of a statute, is invalidated by the enactment. The complaint avers and the demurrer admits, that the performance of the contract is impossible without violating the statutory provision that no greater pressure than three hundred pounds to the square inch shall be put upon pipes used for the transportation of natural gas. We are careful to state the questions upon which we give judgment, and to declare the construction which we give to the complaint upon which those questions arise, so that there may be no misconception of our decision."

The court did not pass upon the constitutional question, urged in this suit as hereinafter stated, whether that part of the act of March 4th, 1891, which forbids maintenance of a pressure along the entire pipe line, by artificial means, of at least three hundred pounds to the square inch, is invalid as placing a restrictive burden upon interstate commerce. That question was not con-

sidered or necessarily involved in its decision. Having it in
view, however, and its lack of pertinency to the issue presented,.
Judge Elliott further said : "We preface our discussion of the
principal question stated, by saying that we are here concerned
only with the general question of the power to regulate the pres--
sure of natural gas in pipes, for, according to the averments of
the complaint, whether natural or artificial pressure be employed,
the contract between the two corporations named cannot be made-
effective without violating the act of 1891 by using more pres-
sure than three hundred pounds to the square inch." And
Judge McBride, who concurred in the conclusion reached by the
majority of the court, in explaining his vote, even more explicitly
disclaimed intention to pass upon it, in this language : "The
legislature may undoubtedly provide for the regulation of the
mode of procuring, using and transporting natural gas in so far
as the act of March 4th, 1891, attempts to do this. It is a
legitimate exercise of the police power of the state, and not an
interference with the power of congress to regulate interstate
commerce. Section 1 of the act, however, contains a provision,.
which, literally construed, forbids the transportation of natural
gas through pipes, otherwise than by the natural pressure of the
gas flowing from the wells, and section two contains a provision,
which, similarly construed, declares it to be unlawful to use any
device or artificial process or appliance to maintain the natural
flow of natural gas. These provisions are not in the nature of
regulation, but are prohibitory in their character. There are,.
however, independent provisions which may be eliminated from
the statute without materially impairing its sufficiency, if its pur-
pose is simply to regulate the production, transportation and use
of natural gas. As I understand the principal opinion, it holds
that, notwithstanding the provisions of the statute, artificial pres--
sure may be applied, provided it does not exceed three hun-
dred pounds to the square inch. Whether this conclusion is
reached by construction, or by eliminating the objectionable
features of the statute, is not material. I concur in the conclu-
sion reached."

After the decision in the Jamieson suit, one Elbert W. Shirk brought suit in the circuit court of Cass county to restrain the Indiana Natural Gas and Oil Company and the Columbus Construction Company from entering upon his lands in the exercise of any right of eminent domain, alleging in his complaint substantially the facts above stated, and that the object to be accomplished by the companies seeking to exercise power of condemnation of his lands was unlawful under the act of March 4th, 1891. In this suit a preliminary injunction was obtained which the court, on the 19th day of October, 1891, on motion in behalf of the companies injured, refused to dissolve.

Notwithstanding the decisions in the Jamieson and Shirk cases, the directors of the construction company, supported by a majority of the stockholders, are still prosecuting the work which that company contracted to perform.

In September, 1891, at a special meeting of the stockholders of the construction company, called for that purpose, the directors were authorized, against the protest of the complainants, by at least a majority in interest of all the stockholders, to levy an assessment of twenty per cent. upon all its unpaid stock. Forty per cent. only of the par value of a majority of the stock held by the complainants has been paid.

The directors, Charles Hequembourg, Charles T. Yerkes, Warren F. Furbeck, George T. Yuille and Sidney A. Kent, who are defendants herein, have levied the assessment authorized, and propose to collect it and apply the moneys they receive from such collection to the payment of the construction company's obligations, and, as well, the prosecution of its work under its contract with the Indiana Natural Gas and Oil Company.

The complainants insist that natural gas cannot be transported from the gas fields in Indiana to the city of Chicago, a distance of one hundred and thirty-six miles, by natural pressure from the gas wells at the entrance to the pipes, where the pressure shall not exceed three hundred pounds, and in support of their insistment produce the affidavits of a number of persons who profess to be familiar with the gas wells of Indiana, their working, and the philosophy of transportation of natural gas through

pipes. They testify that the average natural gas pressure from the Indiana wells is little over three hundred pounds to the square inch, and that in transportation in pipes of eight inches in diameter, the pressure is decreased by friction at the rate of from five to eight pounds per mile, so that gas cannot be carried by natural pressure of three hundred pounds at the inlet to such pipes farther than sixty or seventy miles. This statement is not controverted by the defendants, who in turn show by affidavits, the truth of which is not disputed, that by the use of pumping devices along their pipe line, in the States of Indiana and Illinois, they can maintain a uniform pressure of three hundred pounds to the square inch, which will enable them to deliver natural gas in Chicago in quantities to be commercially profitable.

They claim that when they answered in the Jamieson suit they had not experimented so as to ascertain this fact, and they, therefore, there declared their purpose to be, as in fact it then was, to transport gas at a pressure of six hundred pounds to the square inch. The position they took in that suit required them to combat not only the reasonableness of the law of March 4th, 1891, as a police regulation, but also the prohibition of an artificial maintenance of the allowed pressure of three hundred pounds to the square inch. Since the decision in the Jamieson suit their contract has been modified so that if they may lawfully maintain a pressure of three hundred pounds to the square inch along their entire pipe line, they will be able to comply with their agreement and deliver natural gas in Chicago with profit.

They also insist that neither the Jamieson nor Shirk cases have been disposed of upon final hearing, and that both of them, when finally decided in the state courts, may be reviewed by the supreme court of the United States, and they allege that, in the meantime, they can acquire a right of way for their pipe line, by agreement or purchase, without resort to proceedings in condemnation, and proceed with the execution of their contract.

It has been made to appear very plainly that until after the decision in the Jamieson suit, the complainants actively approved

Benedict v. Columbus Construction Co.

and urged the prosecution of the project of carrying natural gas to Chicago, and did so, as has been stated, in the face of the provisions of the acts of March 9th, 1889, and March 4th, 1891, which they knew and understood. After the passage of the latter of these statutes, they voluntarily paid more than $74,000 on account of their stock subscriptions in furtherance of the work.

I am so fully satisfied with the disposition I have determined to make of this application, upon the central question involved, that I forbear to refer to the allegations and proofs which bear upon the real motive which underlies the prosecution of this suit, and, as well, those which are relied upon as indicative of the complainants' insincerity with this court.

The complainants ask for a preliminary injunction, grounding their prayer upon allegation that it is impossible to attain the real object for which the Columbus Construction Company was formed.

I have no hesitation in reaching the conclusion that such real object was the profitable construction of the pipe line of the Indiana Natural Gas and Oil Company to Chicago. It does not appear that the company is engaged in any other business. From that fact, and the circumstance that it is ultimately to own the entire capital stock of the Indiana Natural Gas and Oil Company, it is manifest that for all the substantial purposes of this suit the two companies may be regarded as one. Whatever of value comes to the natural gas company will go from the construction company, and the former company is to be given to the latter in payment for that value. Unless, then, the pipe line shall be productive of profit, the construction company, by completing its contract, will waste its substance. The proofs, it is true, indicate that the natural gas company may possibly find a market within the State of Indiana, but not one of a value commensurate with the outlay that the construction company must make in completing the work which the contract requires it to do. I think that it is safe to assume, for the purposes of the present application, that if the project of delivering natural gas

in Chicago with profit is clearly unattainable, I should at present stay further expenditure in attempts to carry it out.

It is well settled that the shareholders in a corporation cannot extinguish its charter or dissolve it, and that a court of equity cannot dissolve it at their instance. In the absence of a statutory provision, the franchises can be declared forfeited and extinguished only at the suit of the state in an appropriate proceeding at law. *2 Kent Com. 313; Morawetz Corp. § 282; Verplank v. Mercantile Insurance Co., 1 Edw. Ch. 84; Folger v. Columbian Insurance Co., 99 Mass. 267; National Docks Railway Co. v. Central Railroad Company of New Jersey, 5 Stew. Eq. 755.*

If stockholders in a corporation disapprove of the company's management, which is conducted without fraud, or by action *ultra vires*, or in gross abuse of trust, or shall consider their speculation a bad one, their remedy is to elect new officers or sell their shares and withdraw. Where the question is one of mere discretion in the management of corporate business by directors, or of doubtful event in the undertaking in which the corporation has embarked, remedy cannot be had by application to a court of equity. *Elkins v. Camden and Atlantic Railroad Co., 9 Stew. Eq. 241; Park v. Grant Locomotive Works, 13 Stew. Eq. 114; affirmed on appeal, 18 Stew. Eq. 244.* But where it plainly appears that the object for which the company was formed is impossible of attainment, it becomes the duty of the company's agents to put an end to its operations and wind up its affairs, and should they, even though supported by a majority of the shareholders, pursue operations which *must* eventually be ruinous, any shareholder feeling aggrieved would, upon plain equitable principle, be entitled to the assistance of this court, and a decree should be made compelling the directors to wind up the company's business and distribute the assets among those who are entitled to them, unless they can lawfully be used for other business purposes allowed by the charter. This course is pursued in case of partnerships in similar situation, and, for the reasons there controlling, I perceive no reason why it should not also be pursued in the case of corporations. *Baring v. Dicks, 1 Cox 213;*

Benedict v. Columbus Construction Co.

*Bailey* v. *Ford, 13 Sim. 495 ; Jennings* v. *Baddeley, 3 Kay & J. 78 ; Seighortner* v. *Weissenborn, 5 C. E. Gr. 172, 177 ; 2 Lind. Part. 575 ; Morawetz Corp.* § *284 ; Waite Insolv. Corp.* § *367 ; Cook Stock.* § *631 ; In re Suburban Hotel Co., L. R., 2 Ch. App. 737, 780.* The decree will not extinguish the franchises of the corporation or terminate the corporation's legal existence.

It is perceived, in the statement I have made of the facts in this case, that the defendants claim that if they may lawfully obtain a pressure of three hundred pounds to the square inch throughout their pipe line the success of their enterprise is assured. And when it is considered that the natural pressure from the gas wells is only three hundred pounds to the square inch, and that such pressure, without artificial assistance, as the affidavits annexed to the bill show, has been sufficient to furnish an adequate supply of gas to cities and extensive industries in Indiana, some of which are remote from the gas fields, the reasonableness of this claim becomes apparent and is fairly justified. All that is urged against it, as I remember, is the opinion of a single man, who has made no experiments and no calculations to justify his conclusion. The possibility of the attainment of the real object of incorporation, then, is determined by the question whether artificial means may be resorted to to maintain the pressure of three hundred pounds to the square inch throughout the pipe line. That question is yet undetermined. The supreme court of Indiana, by its decision in the Jamieson case, has merely said that the pressure prescribed by the act of March 4th, 1891, is presumptively reasonable as a police regulation.

Reverting to the act of 1891, it is perceived that its title contemplates not only the "regulation" of transportation of gas, but also the "procuring and using" it. It forbids the owner of a gas well to take gas therefrom by artificial means. He must allow the gas to flow to him. Then, he must restrict the flow, if it should enter his pipes at a pressure in excess of three hundred pounds to the square inch, to that pressure, and then, although his pipes may be of equal strength along their entire line, and although friction lessens the pressure at the rate of from five to

Benedict v. Columbus Construction Co.

eight pounds per mile, he must not do anything to counteract the effect of the friction and maintain the pressure which the legislature admits is safe and reasonable.

It requires but a simple mathematical calculation to ascertain that the effect of this law is to limit transportation of gas to a radius of about sixty miles from the gas wells, and to restrict it within the territorial limits of the State of Indiana.

I fail to perceive the *rationale* of this restrictive element of the law as a police regulation. No reason has been suggested in the argument before me why safety and health demands that the pressure may not be evenly maintained in the pipes; why in the first mile it may be three hundred pounds to the square inch and in the second mile it may not be so great, or why at the place of in-take it may be three hundred pounds and ten miles away it may not be of the same pressure, but must remain, as friction there leaves it, two hundred and fifty pounds, although the pipes at the end of the ten miles are required by the law to be as strong as they are at the place of the in-take. As a police regulation, this provision of the law, upon its face, appears to be an absurdity. And I doubt not that it so appeared to the executive of Indiana, when he withheld his approval of the law, and to the supreme court of that state, when it carefully guarded its opinion so as not to pass upon it.

In view of the hostility exhibited by the gas interests of Indiana to the defendants' scheme, and the unconstitutional act of March 9th, 1889, it is not surprising to find in the act of 1891 something more than a mere police regulation.

I cannot escape the conviction that the purpose of the provision considered was to prevent the transportation of gas without the territorial limits of Indiana.

Such a purpose is unlawful, in that it seeks to impose a burden upon interstate commerce which directly and substantially interferes with its freedom, for it is admittedly impossible to transport gas, with commercial profit, in any other way than through pipes.

Until the national congress interferes by regulating the transportation of natural gas from state to state, it being admittedly

a dangerous commodity, the several states may make reasonable regulations for the protection of the life and health of their citizens against it, and such regulations, when not directed against interstate commerce, but only incidentally and necessarily affecting it, will be upheld as valid. Upon this subject, in *Nashville &c. Railway Co.* v. *Alabama, 128 U. S. 96*, Mr. Justice Field, pronouncing the opinion of the supreme court of the United States, said: " It is conceded that the power of congress to regulate interstate commerce is plenary; that, as incident to it, congress may legislate as to the qualifications, duties and liabilities of employes and others on railway trains engaged in that commerce, and that such legislation will supersede any state action on the subject. But until such legislation is had, it is clearly within the competency of the states to provide against accidents on trains whilst within their limits. Indeed, it is a principle fully recognized by decisions of state and federal courts that wherever there is any business in which, either from the products created or the instrumentalities used, there is danger to life or property, it is not only within the power of the states, but it is among their plainer duties, to make provision against accidents likely to follow in such business, so that the dangers attending it may be guarded against as far as practicable.   *   *   *   Such legislation is not directed against commerce, and only affects it incidentally, and therefore cannot be called, within the meaning of the constitution, a regulation of commerce. As said in *Sherlock* v. *Alling, 93 U. S. 99, 104,* legislation by a state of that character ' relating to the rights, duties and liabilities of citizens, and not indirectly and remotely affecting the operation of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit.' "

But where the state law steps beyond the lawful domain of police regulation and, under its guise or otherwise, seeks by its legislation to restrict interstate commerce, such legislation becomes invalid.

The supreme court of the United States has repeatedly refused to exactly define the line to which the several states by legisla-

tion may incidently affect interstate commerce, preferring to pass specially upon the facts of each case as it shall be presented to them.  In *Hall* v. *DeCuir, 95 U. S. 485,* Chief-Justice Waite said : " The line which separates the power of states from this exclusive power of congress is not always distinctly marked, and oftentimes it is not easy to determine on which side a particular case belongs.  Judges not infrequently differ in their reasons for a decision in which they concur.  Under such circumstances it would be a useless task to undertake to fix an arbitrary rule by which the line must in all cases be located.  It is far better to leave a matter of such delicacy to be settled in each case upon a view of the particular rights involved."  And in *Smith* v. *Alabama, 124 U. S. 465,* Mr. Justice Matthews said : " There are many cases, however, where the acknowledged powers of the state may be exerted and applied in such a manner as to affect foreign or interstate commerce without being intended to operate as commercial regulation.  If their operation and application in such cases regulates such commerce so as to conflict with the regulation of the same subject by congress, either as expressed in positive laws or implied from the absence of legislation, such legislation on the part of the state, to the extent of that conflict, must be regarded as annulled.  To draw the line of interference between the two fields of jurisdiction, and to define and declare the instances of unconstitutional encroachment, is a judicial question often of much difficulty, the solution of which perhaps is not to be found in any single and exact rule of decision.  Some general lines of discrimination, however, have been drawn in various and numerous decisions of this court.  It has been uniformly held, for example, that the states cannot by legislation place burdens upon commerce with foreign nations or among the several states."

In the case of *Sherlock* v. *Alling, 93 U. S. 99,* Mr. Justice Field sums up the character of the laws which had, at that time, been declared to be invalid, in the following language, which was afterwards quoted with approval by Mr. Justice Matthews, in *Smith* v. *Alabama, supra.*  He says : " But, upon an examination of the cases in which they were rendered, it will be found

that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce; or exacted a license fee from parties engaged in commercial pursuits; or created an impediment to the free navigation of some public waters; or prescribed conditions in accordance with which commerce in particular articles, or between particular articles or between particular places, was required to be conducted. In all the cases the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuit in particular channel, or conditions for carrying it on. Thus, in the *Passenger Cases, 7 How. 445,* the laws of New York and Massachusetts exacted a tax from the captains of vessels bringing passengers from foreign ports for every passenger landed. In *Pennsylvania v. Wheeling Bridge, 13 How. 518,* the statute of Virginia authorized the erection of a bridge, which was held to obstruct the free navigation of the river Ohio. In the case of *Sinnot* v. *Davenport, 22 How. 227,* the State of Alabama required the owner of a steamer navigating the waters of the state to file, before the boat left the port of Mobile, in the office of the probate judge of Mobile county, a statement in writing, setting forth the name of the vessel and the owner or owners, and his or their place of residence and interest in the vessel, and prescribed penalties for neglecting the requirement. It thus imposed conditions for carrying on the coasting trade in the waters of the state, in addition to those prescribed by congress. And in all the other cases where legislation of a state has been held to be null for interfering with the commercial power of congress, as in *Brown* v. *Maryland, 12 Wheat. 425; State Tonnage Tax Cases, 12 Wall. 204,* and *Walton* v. *Missouri, ante 847,* the legislation created in the way of tax, license or condition, a direct burden upon commerce, or in some way directly interfered with its freedom."

To the cases cited in this quotation may be added *The Western Union Telegraph Co.* v. *Pendleton, 122 U. S. 347,* in which the Indiana statute attempted to regulate how telegrams, sent in Indiana, should be delivered in other states, and the case of *Hannibal and St. Joseph R. R. Co.* v. *Husen, 95 U. S. 465,* in which a law in Missouri declared that no Texas, Mexican or

Indian cattle should be driven or otherwise conveyed into Miss-
ouri, between May 1st and November 1st, unless carried through
the state in cars without being unloaded, in which Mr. Justice
Strong said : " It seems hardly necessary to argue at length
that, unless the statute can be justified as a legitimate exercise of
the police power of the state, it is a usurpation of the power
vested exclusively in congress. It is a plain regulation of inter-
state commerce, a regulation extending to prohibition. What-
ever may be the power of a state over commerce it is completely
internal ; it can no more prohibit or regulate that which is inter-
state than it can that which is with foreign nations. In short, it
may be laid down as the simple doctrine of this court, at this
day, that a state can no more regulate or impede commerce
among the several states than it can regulate and impede com-
merce with foreign nations."

These cases and quotations will serve to illustrate the course
and inclination of decisions in the United States supreme court.
I think that they very satisfactorily exhibit that the provision
of the statute of Indiana of March 4th, 1891, which I now con-
sider, is objectionable to the freedom of interstate commerce, and
that the United States supreme court will ultimately so decide.

Whether its invalidity will affect the whole act or not, is not
a matter of concern upon this inquiry. The demonstrated inval-
idity of the portion considered is sufficient to exhibit that the
project of the defendants is capable of lawful execution in a
manner which will result in a commercially profitable business.
If all the provisions of the act are so interwoven as to be incapa-
ble of distinct separation, or are of such character that it cannot
be said that the legislature intended that the valid parts shall be
enforced if the other parts fail, the entire law will be held to be
invalid. *State* v. *Kelsey, 15 Vr. 1 ; Van Cleef* v. *Commission-
ers of New Brunswick, 9 Vr. 320 ; Morris* v. *Carter, 17 Vr. 260 ;
Warren* v. *Mayor &c. of Charlestown, 2 Gray 84, 97 ; Common-
wealth* v. *Hitchings, 5 Gray 482 ; Cooley Const. Lim. 211 (*177) ;
United States* v. *Harris, 106 U. S. 629 ; Poindexter* v. *Greenhow,
114 U. S. 270.*

Benedict *v.* Columbus Construction Co.

In that event even more favorable conditions for the profitable prosecution of the defendants' work will exist than were present under the absolutely prohibitory act of March 9th, 1889, when the undertaking had the complainants' cordial and unqualified support. I am inclined, however, to agree with Judge McBride, that the provisions of the act are severable. Yet, even if they are severable, the defendants may be able to show that the restriction of pressure, though it may be a maintained pressure, is an unreasonable and unduly restrictive regulation. It appears to be based upon a recognized ability of pipes to withstand a pressure of four hundred pounds to the square inch. When it is proved that pipes can be made to withstand a pressure of one thousand pounds to the square inch, as the defendants' contract contemplates, or, perhaps, a still greater pressure, the courts may be of opinion that reasonable police regulation will be satisfied by permitting a pressure proportioned to the strength of the pipes used, and the provision which the Indiana supreme court has sustained, upon presumption that the legislative exercise of discretion was honest and intelligent, may yet, by that court, be declared to be invalid.

Thus, in this case, is exhibited a *status* which utterly fails to make such a case as the complainants should present to entitle them to the relief they seek. The burden is upon them to clearly satisfy me that the real object to which the operations of the Columbus Construction Company are directed is unattainable. Failing in this, either because of unsettled law or because of uncertainty as to the facts upon which the irreparability of apprehended injury is predicated, they have no right to a preliminary injunction. Upon an uncertain, conjectural case, this court will not stop an enterprise upon which more than a million and a half of dollars have been expended, and which is rapidly reaching completion, especially when more than two-thirds of those who have embarked their money in it protest that the action desired of the court will work ruin to them.

I will, therefore, discharge the order to show cause and refuse the injunction.