*91 N. J. Eq.*    Villa Site Co. v. Copeland.

VILLA SITE COMPANY et al., respondents,

*v.*

HENRY C. COPELAND, appellant.

[Argued March 5th, 1920.   Decided June 14th, 1920.]

1. The lien of a trustee for advances made by him is limited to (a) payments expressly authorized by the instrument of trust; (b) reasonable expenses in carrying out the directions of the trust; (c) in the absence of such directions, expenses reasonably necessary for the security, protection and preservation of the trust property, or for the prevention of the failure of the trust.

2. On an accounting by a trustee, the burden is on him to establish items of discharge by proper proof, especially by vouchers or other proof of a convincing character.

On appeal from a decree advised by the late Vice-Chancellor Stevens.

The litigation began in 1909 and arose out of a situation created in 1892 by deeds of the Villa Site Company and the Haworth Improvement Company, to the appellant, Copeland, and a contemporaneous trust agreement executed by him. The first step in the suit was a bill by the Villa Site Company praying an account by Copeland as trustee and his removal by the court. Later, Copeland filed a cross-bill praying a lien for his alleged advances under the trust, and a sale of the trust property to satisfy the same. The late Vice-Chancellor Stevens, who heard the case throughout, discovered that the affairs of the Haworth Improvement Company were necessarily involved, and directed that as that company had been adjudicated insolvent and a receiver had been appointed, such receiver be brought into the suit, which was done. An account of the trust was taken before Oscar Keen, Esq., as special master, and on the coming in of his report complainant Villa Site Company excepted and the exceptions were generally sustained. A further account was

taken before another special master, who restated the first account as revised by the court and dealt with other items accrued later. Copeland excepted to this account and by the decree now appealed from his exceptions were in effect overruled. They related to the refusal of the master, under rulings of the court, to allow certain credits, claimed by Copeland, who, moreover, denied the existence of a trust and set up a claim of absolute ownership.

The foregoing indicates in a general way the dispute between the parties and should facilitate an understanding of the details as set out in the following opinion by the learned vice-chancellor, one of several delivered in the course of the suit:

"This suit was commenced on November 19th, 1909, and has been litigated with unusual acrimony ever since.

"Stated in very general terms, it is a suit brought by a small land company in Bergen county to compel defendant, Copeland, who holds the legal title to its lands on an alleged trust, to convey to a new trustee to be appointed by the court. The bill prays for an account and general relief.

"In April, 1892, the Villa Site Company, formed for the purpose of cutting up a farm property in Haworth, Bergen county, into lots and selling them, was in financial straits. The defendant, Copeland, was a New York banker who had theretofore lent it money. He was applied to for a further loan, and to secure him both for what he had already advanced, or become responsible for, and for what he was about to advance, the Villa Site Company, on April 9th, 1892, conveyed to him by deed absolute in form all of its real estate. Within one month thereafter an agreement in writing was executed by it and by Copeland which provided that Copeland would 'hold in trust for and convey to said Villa Site Company, or to any other person or company whom it might name by proper deeds of conveyance containing usual covenants against grantor's acts,' the premises described in the deed of April 9th, 1892, and in another deed made to him by the Haworth Improvement Company, according to the terms and conditions thereinafter mentioned. These conditions were, that he would make conveyance of such parcels as should be sold

by the general agents of the company, and that he would apply the net amounts received 'immediately upon its receipt by him in payment and satisfaction, or part payment and satisfaction *pro tanto,* of the debts and claims set forth' in the schedule thereto annexed, and that upon payment of the last of such claims, he would reconvey the residue then remaining to the company or to any other person or corporation it might name, provided that prior to the conveyance there should be transferred to him one hundred shares of its stock, and that there should be transferred to Wilbur F. Herrick and Kate M. Holbrook ninety-eight shares each.

"Schedule A, appended to this agreement, provided that the application of the moneys received by Copeland should 'be made in the following order as nearly as practical:'

"1. All commissions and expenses to the selling agents.

"2. All taxes, all interests and other payments on mortgages now or hereafter on said property and sufficient sums to procure releases of lots when sold from the lien of mortgages thereon.

"3. All money loaned by Copeland to the company with interest and two notes for $1,800 and $1,000 specifically described.

"4. Four thousand dollars due to Wilbur F. Herrick from Kate M. Holbrook with interest.

"5. Numerous notes specifically enumerated which seem to have been debts contracted by Mrs. Holbrook's husband in promoting the company and improving its property.

"Simultaneously with the making of the foregoing agreement the Villa Site Company entered into an agreement with Wilbur F. Herrick and Kate M. Holbrook, whereby they were employed as its sole and exclusive agents to sell the land referred to in the trust agreement. They were to receive commissions of thirty-three and one-third per cent. on gross sales. If these commissions should amount to more than enough to pay all commissions to subagents and all other expenses of sale, 'including advertising, office rent, printing, stationery, incidentals, &c., and in addition thereto the sum of $150 per month to each of said Herrick and Holbrook, then the balance of said commissions was to be paid and returned into the treasury of the Villa Site Company,' not, it may be observed in passing, to Copeland. The sell-

ing agents' contract was to continue in force for a term of two years, and should Herrick and Holbrook be unsuccessful in disposing of the lots, then it was to continue 'until such time as all other property was sold and the liability canceled and the assets divided.'

"Holbrook and Herrick appear to have been the promoters of the company and to have owned or controlled its stock. The scheme was to secure first to Copeland and then creditors of Holbrook and his wife, and while the land was being disposed of, to keep down charges, such as taxes, &c., and to give to Herrick and Holbrook a salary of $150 a month, each payable only out of the receipts from sales if large enough.

"Herrick and Holbrook were unsuccessful. Few lots were sold and little was done until 1906, thirteen years later, when a new agency contract was concluded with one Smith. He, in the years 1906-1908, was able to make sales aggregating, according to Copeland's answer, $48,000.

"Then the parties quarreled. The Villa Site Company, against Copeland's protest, entered into a new agency contract with one May, and Copeland refusing to give deeds to those to whom May contracted to sell, this bill was filed.

"On July 10th, 1893, i. e., a year after the conveyance, at a stockholders' meeting of the Villa Site Company, Copeland was elected a director to serve with four other directors, viz., Wilbur F. Herrick, Kate M. Holbrook, George Holbrook and William W. Pendleton. From the minutes of this meeting, it appears that three hundred shares of stock were then outstanding and that Wilbur F. Herrick and Kate and George Holbrook represented two hundred and ninety-seven of them. On the same day, at a directors' meeting, Copeland was elected president and treasurer. These offices he held until 1908. No meeting of either stockholders or directors was held between January, 1895, and July, 1906. In 1903, the company's charter was forfeited by proclamation of the governor for non-payment of taxes, but was reinstated in July, 1906.

"Mr. Copeland was in the progress of the litigation directed to account before Oscar Keen as master. According to the re-

port, he had up to that time received: From sales of land, $31,622.20; from other sources, $24,963.86.

"He had disbursed: For taxes, $14,339.90; for principal and interest of mortgages, $18,952.23; for other expenses, $39,-327.92.

"Copeland had on the hearing and before the reference resisted the application to account and denied the trust. He admitted that he had executed the agreement, but he insisted, notwithstanding, it imposed no legal obligation upon him. His position which was, and still is, unintelligible to me, is best expressed in the concluding paragraphs of his answer:

" 'Defendant admits that since the conveyance to him of said property in bill of complaint, he has treated said premises as his own, and has regarded himself as owner thereof in fee-simple, and that he has stated, and he now avers, that he does not hold same as trustee, but, on the contrary, says that he is the legal owner thereof, and that the conveyance thereof by said Villa Site Company and Haworth Improvement Company was absolute and vested in him the legal title, and in accordance with the agreement entered into at that time with complainant, he was to take said property as the owner thereof as security for the advances made and to be made by him and in full satisfaction thereof and was to sell the same when and upon the terms he should deem just, and that out of the said proceeds of the same, he was to reimburse himself for his said advances and the expenses chargeable against said property and was to pay over the balance, if any, to certain persons agreed upon and who are named, and in the order named in Schedule A of the agreement of 1892.'

"The agreement which he thus avers he made differs materially from the written agreement executed by him shortly afterwards which, of course, according to the settled rules of law, superseded it.

"Acting on the idea that he was, to all intents and purposes, absolute owner, he kept no proper account; and his failure to do so has made it difficult, if not impossible, to state with any degree of accuracy the sum which the company now owes him.

"To the account as stated numerous exceptions have been filed by the Villa Site Company. They called in question the propriety of the allowance of many items of disbursements both on the ground that they are not supported by vouchers or proofs and on the ground that, if proved, they are not proper subjects of allowance.

"This necessitates an inquiry into the character of the so-called trust agreement. There is absolutely no proof that it has ever been modified or rescinded. It seems plain that the conveyance and agreement taken together are nothing more than a mortgage security. Out of the moneys received from the sales of the land, Copeland is to pay, first, the commissions of the selling agents, then taxes and interest; then to reimburse himself for advances; and then to pay certain notes contained in a schedule. The land, or what remains of it, is to stand as security in his hands until all these payments are made; after which he is to reconvey what is left to the Villa Site Company. In other words, the land is charged with certain debts and expenses, and is to be reconveyed when these debts and expenses are paid.

"If this be so, it is obvious that the master in stating the account paid no regard to the dual character which Copeland occupied. As so-called trustee under the agreement, he held the land as security for the payment of debts; as president and treasurer, he had those powers of management and disbursements which the company's by-laws gave him. If, as president or treasurer, he did acts or made payments justifiable in themselves, it does not follow that the land is to stand as security for them. Copeland must be able to show that they are covered by the mortgage agreement.

"For instance, he cut off valuable timber and admits that he incurred a loss in so doing. This loss he seeks to charge to the land. It is evident that it is not covered by the mortgage, yet the master allows him for it. Again, the master allows him compensation to the amount of $13,250. This he could only do on the theory that he was practically manager of the company from 1893 to 1910, and that he should have compensation as such. If this be so, the compensation is not secured by the agreement.

"No doubt Copeland when he advanced money insisted upon being put in a position to control expenditure, and so he was made president and treasurer. But the conveyance made and the agreements signed do not warrant the inference that the company intended to do the *ultra vires* act of substituting Copeland for itself and for imposing upon him the obligations and duties which the law imposed upon it. This appears not only from the limited character of the powers conferred by the agreement itself, but by the significant fact that at the very time it was executed the company itself, not Copeland, made an agency contract with Herrick and Holbrook vesting them with large selling powers and giving them a commission intended to cover not only the usual agent's commission for selling, but office rent, advertising, and, it is claimed, grading, &c. One of the provisions of this agreement was, that if the commission thirty-three and one-third per cent. should be more than sufficient to pay commissions of subagents, &c., and, in addition, $150 per month to Herrick and Holbrook, the balance should be returned and paid, not to Copeland, but to the treasury of the company. This agreement was assented to by Copeland in writing. The plan was that the company should sell 'at prices equaling or exceeding two cents per square foot for lots lying east of Herrick road and one cent for lots lying west.' If thus sold Copeland was bound to make a deed just as any mortgagee is bound to make a release of parts of the mortgaged premises if the mortgage so provides.

"The various writings taken together make up a scheme harmonious in itself and within the powers of the company, at least to a certain extent, and the scheme was apparently pursued up to the time of the quarrel. The company improved the land and sold lots whenever sales could be effected. Copeland's duties as mortgagee in trust were performed by his making conveyances when deeds were presented for his signature, paying out of the price commission, taxes and interest, and keeping the balance to reimburse himself and to pay the designated creditors. For this service the agreement provided that he was to have one hundred shares of the company's stock, which have in fact been transferred to him. This compensation, adequate or inadequate in the final

outcome, was the compensation agreed upon. If for performing the duties of president and treasurer he should receive more the allowance must be made by the receiver appointed in a winding-up proceeding.

"I have already stated that the master's report shows that from January 5th, 1894, to November 1st, 1910, Mr. Copeland received from sales of land $31,622.20.

"And that he paid for taxes, assessments, interest on mortgages and releases, $33,292.13.

"This is an overpayment of $1,669.93.

"Mr. Copeland says further that he lent, in addition, $10,-326.20. The master has allowed it. Its correctness was attested by both Herrick and Holbrook as far back as October, 1893. As these gentlemen knew more about it at the time, and had a greater interest in verifying the amount than anyone else, I see no reason to disagree with the master's finding. This money appears to have been lent before, or contemporaneously with, the making of the deed and agreement. Mr. Copeland has no account of the items that go to make it up, but the lack of them is, I think, fairly supplied by Herrick's and Holbrook's written admission that it is correct.

"The master's report shows that Mr. Copeland received from rents, $2,270.16; from sales of wood, $3,557.57; from sources other than sales of land, $19,136.13.

"I do not think he should be charged with these receipts in this account. The only moneys which by the terms of the agreement he was authorized to apply to the payment of taxes, interest and other items mentioned are the moneys derived from the sales of lots. He received the other money not as trustee but as treasurer. Consequently, he cannot in this proceeding be charged with them as mortgagee in trust, nor can he, per contra, be credited with payments in Schedule H, amounting to $39,327.92, excepting the item $10,326.20 already referred to. They were not made by him under the trust agreement. Whether all the items in this schedule should be allowed to him as treasurer, notably the items, ninety-one checks, $3,391.84; sixty-four checks, $1,-480.42, cannot now be decided. Whether the receiver should

allow them unless more satisfactorily explained, may require consideration on the part of that officer

"It may be that in the greatness of figures presented I have overlooked items which ought to be included in the present account on the principle here laid down. If so, counsel may call my attention to them.

"I think that no interest should be charged against Mr. Copeland for money received from sales. It was proper to hold it for the purpose of disbursements, and a sum equivalent to the receipts up to the year 1903 was actually paid out for taxes, interest and releases that had accrued or been given by that time. He should be allowed interest on any balance due him after he began to advance his own money. He should also receive interest on $10,326.20 from the time when interest ceased to be paid to or taken by him.

"It is self-evident that the company's affairs cannot be settled unless a receiver be appointed, but the bill is not drawn with that relief in view. It asks for the appointment of a new trustee in place of Mr. Copeland. If I have correctly apprehended the principle on which this case turns, such an appointment would not be proper. With the limited powers conferred upon the mortgagee in trust, it would fail to meet the situation. Besides Mr. Copeland is entitled to hold his security until payment. If a stockholder will apply for the appointment of a receiver, the whole controversy can be finally determined.

"To avoid misapprehension, I may say that I have not overlooked the fact that on the face of the agreement there appears to be an attempt to apply the land of both the Villa Site and the Haworth companies to the payment of the debts of the Villa Site Company and of individuals; and there appears to be a direction that any surplus remaining, whether it be surplus derived from the Haworth company's lands or the Villa Site Company's lands, be transferred to the Villa Site Company. How far the agreement may in these respects be *ultra vires* and incapable of enforcement, must be left to future determination. This emphasizes the necessity for a receiver of the Villa Site Company. A receiver of the Haworth company has already been appointed."

*Mr. Julian C. Harrison,* for the appellant.

*Mr. Wendell J. Wright,* for the respondent Villa Site Company.

The opinion of the court was delivered by

PARKER, J.

The attack on the decree covers items and classes of items claimed by appellant as credits in his account and disallowed below, and the general theory of the case as formulated by the vice-chancellor. We may say at this point that we concur in his theory as the correct one, and as dispositive of practically all the points urged on this appeal. At the same time we deem it best to consider them specifically as presented.

The first point stated is that appellant "is entitled to credit for all payments to Herrick enumerated in Schedule H of the Keen report."

An examination of the schedule shows that the payments claimed are not within the terms of the trust agreement; and it is not seriously claimed that they are. They would fall, if anywhere, under section 1 of the Schedule A attached to that agreement, and which in the opinion set out above is paraphrased rather than quoted. It reads: "All commissions and expense according to contract this day made between the Villa Site Company, of Haworth, New Jersey, and Wilbur F. Herrick and Kate Minor Holbrook." This agreement, as noted by the vice-chancellor, provides a definite commission of thirty-three and one-third per cent., with certain qualifications not now material, except a limit of $150 per month over specified disbursements. The payments specified in Schedule H seem to have no logical relation to any such scheme. It is now suggested that they are a fair substitute for it; and that payments made to Herrick and not authorized by the trust should be charged against his equitable interest under the trust agreement. As to the first suggestion, we agree with the vice-chancellor that the payments were made not as a trustee, but personally or as an officer of the Villa Site Company, and while in the latter case no

doubt recoverable from that company, they were not chargeable as liens in favor of Copeland under the trust agreement. As to the second suggestion, we do not find that the claim of Copeland against Herrick's interest was raised by the pleadings. Certainly it is not adjudicated, the questions determined relating to what credits Copeland is to have as against the land of the Villa Site Company for expenditures under the trust agreement.

The second and third points relate to items for which credit is claimed, and which appear in Schedule H as, "sixty-four checks, $1,480.42; ninety-one checks, $3,391.84." As to these, there seems to be no evidence whatever except that in Copeland's pass-book these totals are entered as of checks paid out of the trust account. The checks themselves were not produced and there is nothing to show their respective dates, amounts, name or payee, or for what given. The duty of a trustee to keep proper accounts and submit proper vouchers is too well settled to need discussion; and while in some cases he may be excused from producing vouchers, the burden of proof of all items of discharge is on him. The subject was recently discussed by the present chancellor in *Smith* v. *Robinson, 83 N. J. Eq. 384.* On these claims there was no proof worthy of the name.

The fourth point is a similar claim for allowance of what is called the "Gray National Bank" note, also in Schedule H. An examination of this instrument shows it to be signed by "T. W. Holbrook, Vice-Prest." (of the Haworth Improvement Company as Copeland testified) to the order of H. C. Copeland. Nowhere does the name of Villa Site Company appear thereon; and why it should be fastened on the assets of that company is not made plain.

The fifth point is a repetition of the claim relating to sundry disbursements in Schedule H, and is covered by what has been said under the first point.

. The sixth point is, that even if the moneys disbursed by Copeland were paid without regard to the terms of the trust agreement, the company should not be allowed to lift the trust deed (tantamount to a mortgage) unless on repayment of all moneys

advanced for its benefit. There are authorities which hold that a trustee is entitled to a lien on the trust property for outlays properly incurred and paid for its care and preservation, in connection with the performance of the trust. The rule, as laid down by Professor Pomeroy, is this:

"The trustee is entitled to be allowed * * * for all his proper expenses out of pocket, which include all payments expressly authorized by the instrument of trust; all reasonable expenses in carrying out the directions of the trust, and, in the absence of any such directions, all expenses reasonably necessary for the security, protection and preservation of the trust property, or for the prevention of a failure of the trust. * * * Where a trustee properly advances money for any of the above-mentioned objects, so that he is entitled to reimbursement, he also has a lien as security for the claim, either upon the *corpus* of the trust property or upon the income, as the case may be; but for moneys improperly paid there is no lien." *Pom. Eq. Jur.* § *1085.*

This was the rule adopted by this court in *Turton* v. *Grant, 86 N. J. Eq. 191.* Applying it to the present case, we agree with the vice-chancellor that the moneys disallowed, so far as shown to have been actually paid, are not shown to have been paid for purposes that bring them within the scope of the rule; and hence are not proper either for allowance in the account or for a basis of lien. This result disposes also of the eighth and last point.

The seventh point is, that the Haworth Improvement Company had no equitable interest in the subject-matter of the suit, and that consequently there should have been no adjudication in the decree recognizing the receiver of that company. In answer to this it is sufficient to say that a reading of the deeds made contemporaneously by the Haworth Improvement Company and its sister concern, the Villa Site Company, to Copeland, and the trust agreement reciting such deeds and describing in detail the properties and setting out the terms of the trust, makes it quite obvious that the Haworth company became a *cestui que trust* on terms substantially identical with those affecting the Villa Site Company.

These considerations lead to an affirmance of the decree in all respects.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER, ACKERSON—14.

*For reversal*—None.