This is a stockholders' derivative suit commenced by complainants by bill filed September 12th, 1938, for the benefit of Breeze Corporations, Inc., named as a nominal defendant. Subsequently an addition to the bill by way of supplement was filed. The original complainants were seventy-nine in number holding 8,662 shares of stock of whom some have since disposed of their shares, leaving forty-one remaining who hold 4,044 shares. After hearings in the cause had commenced a "stockholders protective committee" was permitted to intervene representing 261 stockholders holding 19,287 shares, there being 134 of such stockholders now remaining with a total of 7,769 shares.
The real defendants are Joseph J. Mascuch (hereinafter called Mascuch), John T. Mascuch, A. Langstaff Johnston, Jr., Joseph F. Lucas, Emile L. Beh and Melville C. Healy who *Page 587 
constituted the board of directors of the corporation from the time of its organization and throughout the years covered by complainants' charges (except for a very short duration), as well as being corporate officers. During the same period Mascuch held the office of president and John T. Mascuch that of secretary-treasurer.
The charges against the officers and directors are that they were wholly dominated and controlled by Mascuch and that he, with the assent and compliance of his fellow directors and officers, directed corporate actions for his personal advantage and profit. The complainants contend that at the organization of the defendant corporation, Mascuch caused certain assets to be transferred to it at a fictitious value and received a large number of shares in payment therefor based on an exorbitant valuation of such assets; that subsequently he caused his fellow directors to authorize the issue to him of another large number of shares in consideration of his grant of certain rights in various patents which he claimed to own, at a value therefor which was false and fictitious; that he and other officers were permitted to withdraw company funds for their own use for which no services were rendered and that he caused unlawful credits in his favor to be set up on the corporation's books; that the individual defendants caused false and misleading financial statements to be issued for the purpose of selling corporate stock to the public and for the further purpose of declaring dividends, more than one-third of which dividends they received on the stock held by them. By their supplemental bill complainants charge that large payments were improperly made with corporate funds for services alleged to have been rendered for the sole benefit of the individual defendants, in aid of their contest against complainants' causes of action.
The relief sought by complainants at the conclusion of the hearings may be stated generally thus: That the individual defendants be required to account for and pay to the defendant corporation for losses and damages sustained by the corporation through their illegal acts and that they be removed as officers and directors; that the stock issued to Mascuch as consideration for the assets transferred by him to the defendant *Page 588 
corporation at an unconscionable and inadequate valuation, be decreed void and be surrendered for cancellation.
 1.
The briefs for the corporate and individual defendants urge at great length that certain individuals, namely Messrs. Bergen, Garey and Pistell, who are not parties to the cause, are the real complainants and are using the complainants named in the bill and those who have intervened for the purpose of obtaining control of the defendant corporation for the "real complainants."
In October, 1936, an underwriting agreement was entered into between the defendant corporation and John J. Bergen Co., Ltd., whereby the latter agreed to sell to the public 100,000 shares of the corporate defendant's stock. Bergen and Garey were officers of the underwriter and Pistell was their associate. In offering that stock to the public the individual defendants, particularly Mascuch, caused a registration statement and prospectus as of January 13th, 1937, to be filed with Securities and Exchange Commission (hereinafter called S.E.C.) for the purpose of giving information to the public concerning the assets, business and financial status of the defendant corporation, and relying on that statement S.E.C. authorized the proposed stock issue and the underwriter proceeded to and did sell the 100,000 shares of stock to many individuals. In August, 1937, S.E.C. suspended the effectiveness of the registration statement on the ground that it contained untrue statements, omitted material facts and was misleading. Because of untrue representations made under oath by Mascuch in that registration statement, he was indicted for and convicted of perjury and is now serving a sentence in a federal prison. One result of the action of S.E.C. in suspending the registration statement was that the market price of the stock dropped below that at which the underwriter had sold it and in consequence many complaints were received by the underwriter from its customers. In addition the underwriter contended that the defendant corporation's annual report for 1937 which the individual defendants *Page 589 
had caused to be issued, was false in that it showed a profit for that year whereas it should have shown a loss, and therefore injuriously affected the interests of its customers.
The business success of an underwriter depends on the goodwill of its customers and the maintenance of that goodwill requires that the underwriter shall protect investors to whom it sells securities and, if it is deemed necessary, aid them in securing restoration to the corporation in which they were induced to invest, of any funds unlawfully abstracted from the corporation's treasury. In the performance of the obligation which this underwriter felt it was under to its customers it circularized them, outlining the facts in its possession and suggesting that they join in a suit against the defendants herein, and after the suit had been instituted by those stockholders who adopted the suggestion and who are named as complainants in the bill, it caused the stockholders protective committee to be formed and solicited other stockholders to join it and thereby become intervenors in the instituted suit. It is my opinion that the stockholders on being informed of the facts in the underwriter's possession and in joining in this suit to enforce their rights, became actual and real complainants. After all and regardless of ulterior motive on the part of the underwriter (as to which there is no supporting proof but merely suspicion of the individual defendants), the question to be determined is whether the individual defendants are guilty of the wrongdoing charged against them by complainants, and in seeking to enforce their rights the complainants are not chargeable with notice of any facts or information concerning the corporate defendant's management or affairs, merely because such facts or information became known to or were available to the underwriter. It is to be noted that three of the complainants were stockholders prior to the underwriter's sale and as to them the motives and knowledge of the underwriter are clearly immaterial.
 2.
The corporate defendant was organized October 20th, 1926, with an authorized capital of 20,000 shares of no par value *Page 590 
by Joseph J. Mascuch and his brother John T. Mascuch and their nominees, and it took over the assets of Cox Corporation, Breeze Metal Hose Manufacturing Co. and Provident Machine Co., which three corporations were then owned and dominated by Mascuch.
Cox Corporation was incorporated in 1923 by Mascuch and was engaged primarily in the sale of patented automobile bumpers. In December, 1925, it had no assets other than its patent rights and a few small accounts receivable, and until some time after January 1st, 1926, it had issued no stock. Shortly before its assets were taken over by defendant corporation it had made an unsuccessful attempt to obtain a bank loan. It had entered into an agreement with Sheldon Axle Spring Co. for the manufacture by the latter of automobile bumpers and a breach of that contract having occurred, Cox Corporation was seeking another connection for the manufacture of bumpers. In July, 1926, it bought all the capital stock of Provident Machine Co., then a sales corporation engaged in selling brake lining machines, from John B. Katz for $10,000 payable $1,000 in cash and the balance in two notes, one for $3,000 due February 1st, 1927, and the other for $6,000 due August 1st, 1927. Breeze Metal Hose Manufacturing Co. was organized in 1907 and had been engaged in the manufacture of flexible tubing and carburetors. August 4th, 1926, Cox Corporation bought all its capital stock from C.S. O'Loughlin, for $40,000 payable $1,000 in cash and the balance in installments, which balance of $39,000 was still due O'Loughlin in November, 1926.
The first meeting of incorporators of defendant corporation was held November 3d 1926, at which the assets of the three corporations were offered to and acquired by defendant corporation by three bills of sale dated November 1st, 1926. For the assets of Cox Corporation, which included patents at a stated value of $460,000, the defendant corporation issued 4,937 of its shares at a valuation of $455,143.48; for the assets of Breeze Metal Hose Manufacturing Co., which included patents valued at $250,000, the defendant corporation issued 3,938 of its shares at a valuation of $407,703.72; for the assets of Provident Machine Co., which included *Page 591 
patents valued at $40,000, the defendant corporation issued 456 of its shares at a valuation of $47,238.22, and beside such issues of stock the defendant corporation assumed the liabilities of the three corporations whose assets it had purchased and agreed to pay all lawful fees in the prosecution and defense of the patent applications and patents. Thus the defendant corporation authorized the issue to Mascuch and his nominees of 9,331 of its shares at a total valuation of $910,085.42 for assets claimed to be owned by the three corporations, of two of which Cox Corporation had acquired all the capital stock a few months previously for an outlay of $1,000 cash to O'Loughlin and a like sum in cash to Katz, and the other assets owned and sold by Cox Corporation, outside of its patent rights, had but little tangible value.
How did it happen that the assets of Breeze Metal Hose 
Manufacturing Co. in which all the capital stock of that company was purchased by Cox Corporation from O'Loughlin in August, 1926, for a cash expenditure of $1,000 and for which defendant corporation was liable to pay O'Loughlin the further sum of $39,000, became worth $407,703.72 a few months later?
The substantial asset purchased by defendant corporation from Breeze Metal Hose Manufacturing Co. consisted of patents which were given a value of $250,000. The bill of sale from Breeze Metal Hose Manufacturing Co. to defendant corporation does not contain a list of the patents sold. A patent attorney who specializes in searching patent titles, testified that an examination of the records in the United States patent office disclosed no patents in the name of Breeze Metal Hose 
Manufacturing Co. and there was no proof of any patent assignment ever made by that company to defendant corporation. Mascuch testified to two such patents, one of which issued in 1916 he said had been assigned by the patentee to Breeze Carburetor Co., which had changed its name to Breeze Metal Hose Manufacturing Co. but he could not produce the assignment or give its date; the second patent he said had been assigned to Breeze Motor Manufacturing Co. but he could not produce the assignment or give its date. Moreover it appears that the second patent had been *Page 592 
issued in February, 1909, and since the legal life of a patent is seventeen years, it had expired prior to the organization of defendant corporation. Both patents had been issued for carburetors but no sale of the patented article was ever made by defendant corporation.
An income tax report for Breeze Metal Hose Manufacturing Co. filed for the period January 1st, 1926, to October 31st, 1926, shows that on January 1st, 1926, if any patents were held by that company they were given no value, while on October 31st of the same year patents were valued at $3,512 with an alleged added development cost of $30,000 although, as I have stated, it is not shown that the company owned any patents or, if it owned the two patents mentioned, it would have expended $30,000 in the development of such old patents under which no sales were thereafter made by defendant corporation. Nevertheless the patents claimed to have been owned by Breeze Metal Hose 
Manufacturing Co. and given a value of $3,512 as of October 31st, 1926, were sold the next day to defendant corporation for $250,000.
Cox Corporation had purchased all the capital stock of Provident Machine Co. from Katz for $10,000 in July, 1926, paying him $1,000 cash and $9,000 in notes which notes were subsequently paid by defendant corporation, and the assets of Provident Machine Co. were transferred to defendant corporation by bill of sale dated November 1st, 1926, for $47,238.22, included in which assets were patents valued at $40,000. How did those assets which Cox Corporation acquired for $1,000 in cash in July, 1926, by virtue of its ownership of all the capital stock of Provident Machine Co., come to be worth $47,238.22 in November of the same year?
Provident Machine Co. filed an income tax report for the period January 1st, 1926, to October 31st, 1926, which shows patents valued at $11,579.53, yet the day following the end of the period reported the defendant corporation took over what patents Provident Machine Co. claimed to own, at a value of $40,000. The bill of sale for those assets does not contain a list of the patents. The patent title search before referred to shows no patents assigned by Provident Machine Co. to defendant corporation and none was produced. *Page 593 
Mascuch referred to one patent issued to Provident Machine Co. but could not produce an assignment thereof to defendant corporation or give the date of such an assignment.
Mascuch continued to own all the capital stock of Provident Machine Co. and in February, 1934, caused its corporate title to be changed to Provident Aircraft Corporation and under that name the corporation was continued in existence until 1939, but its franchise taxes were paid by defendant corporation. In July, 1933, an assignment of a patent granted to one Draim, covering a quick-acting clamp was executed by Draim to Provident Machine Co. and duly recorded in the United States patent office. Although in subsequent statements issued by defendant corporation the quick-acting clamp patent is listed as owned by defendant corporation, neither it nor any interest therein has ever been assigned to defendant corporation.
The assets of Cox Corporation were purchased by defendant corporation in November, 1926, for stock valued at $455,143.48, included in which were patents at a value of $460,000. If Cox Corporation owned no patents of such value then Cox Corporation had an excess of liabilities over assets. Were there any such patents transferred to defendant corporation? The bill of sale from Cox Corporation lists none and Mascuch testified to but one standing in the name of Cox Corporation, and that was a patent issued October 20th, 1925, to one O'Loughlin and by him assigned to Cox Corporation April 17th, 1925, but never assigned to defendant corporation. By license agreement between Mascuch and defendant corporation under date of November 3d 1926, Mascuch granted to defendant corporation the exclusive license on all pending and future patent applications which might be issued to him, so long as he maintained an executive position with defendant corporation, which license agreement of course can have no reference to patents owned by Cox Corporation prior to that date.
An income tax report filed by Cox Corporation for the period January 1st, 1926, to October 1st, 1926, discloses that no value was given to patents on January 1st, 1926, but that the company claimed patents valued at $225,300 October 31st, *Page 594 
1926, and those were the "patents" sold the following day to defendant corporation for $460,000.
There were patents for bumpers standing in the name of Mascuch and his brother John T. Mascuch in 1926 for which they now claim they had given an exclusive license to Cox Corporation and that such license passed to defendant corporation under the sale of November 3d 1926, but complainants claim that those patents actually belonged to Cox Corporation although not standing in its name, and passed to defendant corporation under said sale (which claim will be considered hereinafter) and that such patents were of no practical value to defendant corporation because the demand for bumpers was falling off. For the year 1927 defendant corporation's sales thereof amounted to less than $25,000 and no bumpers were sold thereafter by defendant corporation.
The individual defendants contend that the total value of $750,000 placed on the patents sold to defendant corporation was not fictitious but was real, having been determined by appraisal made by Loughridge, a patent attorney for Cox Corporation. They claim that the appraisal was made prior to November 1st, 1926, but the appraisal report is dated November 23d 1926. Examination of it discloses that Loughridge assigned no value to the two carburetor patents said to have been owned by Breeze Metal Hose 
Manufacturing Co. although not standing in the name of that company, or to the quick-acting clamp patent standing in the name of Provident Machine Co., and that his valuation of $750,000 was predicated entirely on an estimated gross sales of bumpers of $1,500,000 annually for ten years and was computed on the basis of a five per cent. royalty on such gross sales, amounting to $75,000 a year or a total of $750,000 for ten years. Loughridge made no investigation of the ownership of the patents he was supposed to appraise and made no study of them, or of the market demand therefor, or of the cost of production, but arrived at a mere arbitrary figure based on what he guessed would be gross sales for ten years. That the appraisal was grossly erroneous is shown by the fact that the corporation at that time had no manufacturer for its bumpers, that its sales were falling off and that the gross sales of *Page 595 
bumpers made by defendant corporation in 1927 were less than $25,000 and no sales were made after that year. The appraisal was subsequently rejected by the S.E.C.
The minutes of a directors' meeting of defendant corporation held October 21st, 1936, show that assets sold to the defendant corporation in November, 1926, were overvalued, because at such meeting Mascuch requested the board's approval to charge off two items of overstatements of net assets acquired for capital stock at the organization of the corporation, (a) $23,864.30 for assets twice included by error in the inventory, and (b) $9,000 for liability omitted by error from liabilities assumed. That was an admission that on Mascuch's sale of the assets of the three predecessor corporations for stock of defendant corporation, those assets had been overvalued to the extent of $32,864.30, but an equivalent amount of stock received for overvalued assets was not returned to defendant corporation.
Not content with having secured 9,331 shares of defendant corporation in exchange for overvalued assets of Cox Corporation, Breeze Metal Hose Manufacturing Co. and Provident Machine Co., Mascuch caused the directors of defendant corporation to adopt a resolution at a meeting held November 8th, 1926, authorizing the issue to such parties as directed by the officers, of 1,402 shares of stock at a valuation of $201,100 for services rendered, pursuant to which resolution such shares were issued to Mascuch, thus giving him a majority of the then authorized capital stock of defendant corporation. The evidence as to what such services were is that they consisted wholly of putting the three corporations together and assembling them into defendant corporation. Mascuch testified that he subsequently distributed some of such stock to various persons who he claimed, along with himself, had rendered such services and on the corporation's books the issuance of such stock was charged to goodwill as well as services. There is not the slightest evidence that in the acquisition of the three corporations any item of goodwill was considered (it was not mentioned in their bills of sale), neither does any reason appear why the defendant corporation should have compensated Mascuch or any one who may have been associated *Page 596 
with him, for services in selling assets to defendant corporation at an unconscionable valuation, all of which assets were owned by Mascuch and his brother although held in corporate names. It is evident that 1,402 shares of defendant corporation were issued to Mascuch without consideration.
I think that a liberal valuation of the assets of Cox Corporation, Breeze Metal Hose Manufacturing Co. and Provident Machine Co. taken over by defendant corporation in November, 1926, at $910,085.42 would not exceed $50,000 and I therefore find that of the 9,331 shares of defendant corporation issued to Mascuch for those assets, he should be decreed to return to the defendant corporation for cancellation a proportionate number of the shares he so received and that he should also be decreed to return to defendant corporation for cancellation the 1,402 shares issued to him for alleged services rendered. When the issuance of the 9,331 and 1,402 shares was authorized, shares had no par value. A few months later the par value of shares was changed to $10 each and the evidence satisfies me that it was the $10 par value shares which were issued to Mascuch and his nominees, but defendant corporation may have made more than one other change in the value of its shares since that time, and stockholders may have exchanged their $10 shares for shares of different or no par value. If such exchange has been made and a greater or lesser number of shares have been issued to Mascuch for his original 10,733 shares, adjustment should be made accordingly. If counsel cannot agree on such adjustment they may apply to me for further direction.
 3.
The defendants contend that the complainant stockholders have no right to complain of the transactions connnected with the organization of defendant corporation whereby 10,733 shares of stock were issued to Mascuch and his friends because those transactions occurred prior to complainants' acquisition of stock, the argument being that in November, 1926, the defendant corporation was a closed or family corporation owned by Mascuch and his brother; that the assets of the *Page 597 
three predecessor corporations were not acquired for money paid out by defendant corporation but through an exchange of assets for stock and that if the valuation of the assets was excessive, such excess was reflected in the value of the stock taken by Mascuch in exchange for the assets, therefore no one other than Mascuch could have suffered from the transactions.
I think, however, that in organizing defendant corporation Mascuch had in mind a stock promotion scheme and contemplated sale to the public of stock issued to him, as well as of treasury stock and further stock issues which he was in a position to cause to be authorized. In such a situation a promoter stands in a trust relation toward subsequent purchasers of stock and should be required to account to them or to the corporation for his secret profits. (Plaquemines Tropical Fruit Co. v. Buck,52 N.J. Eq. 219; Woodbury Heights Land Co. v. Loudenslager,55 N.J. Eq. 78; modified, 58 N.J. Eq. 556; Donald v. AmericanSmelting, c., Co., 62 N.J. Eq. 729; Bigelow v. Old DominionCopper, c., Co., 74 N.J. Eq. 457; Arnold v. Searing, 78 N.J. Eq. 146; Holcombe v. Trenton White City Co., 80 N.J. Eq. 122;affirmed, 82 N.J. Eq. 364; Tooker v. National Sugar RefiningCo., 80 N.J. Eq. 305; Bliss v. Linden Cemetery Association,83 N.J. Eq. 494; Allenhurst Park Estates v. Smith, 101 N.J. Eq. 581.)
January 18th, 1927, a special meeting of stockholders of defendant corporation was called at which an increase of capital stock (then 20,000 shares of no par value) was authorized to 200,000 shares of $10 par, the minutes reciting that the object of the change was to secure a better market for the sale of stock. Accordingly an amendment to the certificate of incorporation was prepared and sworn to by the incorporators January 21st, 1927, but because the corporation did not then have funds available with which to pay the filing fee, the amendment was not filed with the Secretary of State until April 4th, 1927. However, on February 24th, 1927, Mascuch had caused newspaper advertisement to be published offering stock of defendant corporation for sale and he proceeded to arrange for sales of stock through three corporations. In July, 1927, he caused Bankers Investment Co. to be incorporated *Page 598 
at an expense of $1,300 paid for by defendant corporation. One Chalke, a friend of Mascuch, was made head of that corporation and Mascuch held a power of attorney for all stock standing in Chalke's name. One Verrier, who was in the hardware business and a friend of Mascuch, was made treasurer, although Verrier had no interest in the corporation, knew nothing about its affairs and merely signed checks brought to him by Mascuch. The J.R. Smith Investment Co. was another corporation controlled by Mascuch of which Chalke was secretary, through which stock sales were made, and the third corporation was Craig-Ward Co. in which concern Mascuch disclaimed any interest, although he admitted an interest in liquidating it because he said it owed defendant corporation money. In 1927 and 1928 36,328 shares of defendant corporation were sold at a par value of $363,280, the expense of such sales, including stock issued as bonus, was $294,421.15, so that defendant corporation realized but $68,858.85 from such sales.
 4.
The minutes of defendant corporation show that at a special meeting of directors held May 15th, 1933, Mascuch offered to sell to defendant corporation certain patents and patent applications in consideration of 43,000 shares of stock, and to give defendant corporation an exclusive license to all other patents and patent applications in consideration of receiving a new employment contract to take the place of the employment and license agreement entered into by Mascuch with defendant corporation in November, 1926. The directors at that time beside Mascuch, were John T. Mascuch, Johnston (vice-president of defendant corporation), Beh, Lucas (a first cousin of Mascuch and sales manager of the corporation), Healy (bookkeeper and treasurer) and Rodman (an employee), all of whom were under Mascuch's control with the possible exception of Beh who had never examined the company's patent portfolio and who testified he relied on Johnston's supposed patent knowledge. Said minutes show that Mascuch's proposal was in writing and had annexed *Page 599 
thereto a formal agreement to sell certain patents, patent applications and serial patent applications enumerated therein and that it was resolved by the directors that the license agreement of November, 1926, be terminated and a new employment and license agreement be entered into; that Mascuch's offer of sale be accepted and that the offer and copy of the contract be annexed to the minutes and be deemed part thereof.
But the copy of the contract is not annexed to the minutes. At the hearing of this cause John T. Mascuch produced a carbon copy of a contract dated May 15th, 1933, executed by Mascuch and defendant corporation, which he testified was the final agreement after the preparation of several preliminary drafts, which agreement was received in evidence as Exhibit C-65.
Complainants produced a duplicate original of an executed contract between the same parties, dated May 15th, 1933, which complainants insist is the final agreement as authorized by the minutes of that date and it was received in evidence as ExhibitC-112. The two exhibits differ in several important respects and much evidence was taken for the purpose of enabling the court to determine which of the two is the true agreement pursuant to which defendant corporation issued 43,000 shares to Mascuch, which evidence is too long to here recite or to even comment on, and I shall merely state that C-112 appears to conform to the record of the transaction as appears by the corporate minutes and that C-65 does not and that I consider C-112 as the true agreement between the parties, as prepared by counsel for defendant corporation, as authorized by the directors at the meeting of May 15th, 1933, and as executed at that meeting.
In any event the defendant corporation issued 43,000 shares of stock to Mascuch for patents he claimed to own but which complainants contend were only the same bumper patents sold to defendant corporation by Cox Corporation in November, 1926, on Mascuch's representation that they were owned by the latter corporation. On the other hand the individual defendants now contend that the patents offered for sale in 1933 were owned by Mascuch and his brother and that Cox Corporation never had more than an exclusive license for *Page 600 
their use. I find the complainants' contention supported by the facts and the law. Mascuch was really the Cox Corporation and in the 1926 sale of assets of that corporation to defendant corporation he represented that included in those assets were bumper patents owned by Cox Corporation valued at $460,000, and defendant Johnston testified that prior to the purchase of those assets by defendant corporation he had been informed by Mascuch that Cox Corporation owned those patents.
It will be remembered that in November, 1926, defendant corporation took over all assets of Cox Corporation in which were included patents represented to be owned by Cox Corporation value at $460,000 and the bill of sale from Cox Corporation to defendant corporation purported to transfer patents with Mascuch's warranty of title, and not merely a license for the use of patents. No record connected with that transaction listed such patents and no patents were actually assigned by Cox Corporation to defendant corporation up to 1933; they still stood in Mascuch's name. Mascuch could not produce a license agreement from himself to Cox Corporation because, as he testified, it was not in writing. He further testified he could not recall whether he had assigned the bumper patents to Cox Corporation for $225,000 in stock of that corporation issued to him, but he said he might have done so, and it appears that Cox Corporation, which had issued no stock prior to January 1st, 1926, had 225,000 shares of stock outstanding on October 31st, 1926. In June, 1926, Mascuch, as president of Cox Corporation, stated under oath in a suit brought by Cox Corporation against Sheldon Axle Spring Co., that Cox Corporation owned or controlled certain inventions on automobile bumpers and later, in the same suit, he identified certain letters patent as invented and developed by Cox Corporation and its officers, among which was one for which he had requested the United States patent office to issue letters patent to Cox Corporation but had subsequently canceled his request and had the patent issued to himself. In several other proceedings, as shown by the evidence in this cause, Mascuch represented that the bumper patents had been assigned to Cox Corporation. He should *Page 601 
not now be heard to deny that they were purchased by defendant corporation in 1926. (Scheck v. Bowne, 113 N.J. Eq. 51; BethHamedresh Hagodol v. Isserman, 121 N.J. Eq. 335; affirmed,125 N.J. Eq. 354; Central Railroad Co. v. MacCartney,68 N.J. Law 165; New Jersey Suburban Water Co. v. Harrison,122 N.J. Law 189; Cook v. Sterling Electric Co., 150 Fed. Rep. 766.) I am satisfied that the patents the directors of defendant corporation bought from Mascuch in 1933 were the same patents purchased by their corporation from Cox Corporation in 1926 on Mascuch's representation that they were then owned by that corporation. None of the directors, other than Mascuch and his brother, had accurate knowledge of what patents defendant corporation was supposed to own in 1933 when they had before them Mascuch's offer to sell patents to their corporation, and they made no investigation to ascertain whether or not he had good title to them, or what their value was to their corporation, but they acted blindly in voting to accept his offer and certainly without exercising sound and independent judgment in authorizing the issue of 43,000 shares to him.
I have referred to the agreement made by Mascuch with defendant corporation November 3d 1926, whereby he gave said defendant an exclusive license covering all patent applications then pending and thereafter to be filed, for a term co-extensive with his employment by defendant corporation. That agreement was terminated at the directors' meeting of May 15th, 1933, and a new agreement was made as appears by the minutes and C-112.
By the old agreement, if Mascuch's employment with the defendant corporation terminated, the corporation would merely lose the use of patent applications present and future for which patents might be issued, and would be under no future liability to Mascuch but under C-112, if his employment ceased he was to be paid a 10% royalty on all patents, apparently including those for which he was paid 43,000 shares. Under the old agreement the defendant corporation had an exclusive license on ignition shieldings for which patent applications were filed in 1929 but for which patents were not issued until 1938. Litigation was pending in 1933 *Page 602 
over those patents, the considerable expanse of which litigation was borne by defendant corporation, so that in 1933 defendant corporation had not acquired title to those patents for which letters were subsequently issued to Mascuch, and he might have converted his title into a license on which he would have been entitled to a royalty of 10%, at the same time retaining ownership of the patents.
Upon what evidence or knowledge did the directors determine the value of the patents for which they issued 43,000 shares to Mascuch? They had no patent search and no appraisal other than Loughridge's appraisal of 1926, which was of no value. They apparently guessed at a value of $750,000, for directors Healy and Lucas testified that the directors gave no value to the bumper patents and determined that the other patents, which included radio shieldings and aircraft applications, had a potential profit value of $75,000 annually which would continue for ten years and were therefore worth $750,000, in which method of fixing value directors Johnston, Beh and John T. Mascuch testified they concurred. Director Johnston, who claimed some knowledge of patents, could only say that he considered 43,000 shares of stock as fair value for the patents involved and he was unable to state his idea of value for any particular patent and admitted that no patent has value until its value is proven, so that if the value fixed in 1933 was a potential one and if the annual profits therefrom did not reach the directors' guess, or if the patents or some of them proved worthless, Mascuch had the stock given him as well as 10% royalty on such profits as might be realized from their use. As a matter of fact the exhibits in evidence show that in each year from 1927 to 1932 inclusive defendant corporation had an operating loss, except 1931 when there was a profit of $3,962.29, therefore it cannot be conceived how the directors could have expected a profit of $75,000 in 1933 and in each of the succeeding ten years. Three months after the purchase of the patents the directors wrote the patents and patent applications down to $1 and three months later that write-down was canceled and they were given a value of $750,000, and in April, 1938, the directors again wrote the patents down to $1 after *Page 603 
S.E.C. had criticised the valuation at which the patents and patent applications were carried on defendant corporation's books and had suspended the effectiveness of the corporation's registration statement.
In connection with the sale of the patents to defendant and the receipt by Mascuch of 43,000 shares therefor, it is significant that early in 1933 Mascuch was negotiating with Bartley 
Company, underwriters, for a sale of the defendant corporation's stock and in September, 1933, the capitalization was increased from 200,000 shares of $10 par value to 300,000 shares of no par value, but the negotiations for that stock sale fell through.
November 4th, 1936, a new agreement ratified by the directors was entered into between Mascuch and defendant corporation superseding the agreement of May 15th, 1933, by which new agreement it was agreed, among other things, that Mascuch should serve as general manager of defendant corporation from January 1st, 1937, to December 31st, 1942, at a salary of $12,000 a year (which was double the salary theretofore paid him); that he should receive a bonus of 5% on annual net profits in excess of $300,000; that he be given stock purchase warrants to purchase 500,000 shares; that Mascuch confirms all assignments and transfers of patents made or intended to be made under the agreement of May 15th, 1933; that as to all inventions made by him after May 15th, 1933, and not transferred under the contract of that date, the corporation shall have exclusive license to manufacture and sell without payment of royalty or other cost, so long as Mascuch remains in the corporation's employ. One purpose of the agreement of November 4th, 1936, was to require Mascuch to deliver absolute title to the corporation of the patents and patent applications referred to in the agreement of May 15th, 1933. Although the corporation has performed its part of said agreement, Mascuch has not executed and delivered assignments of such patents and patent applications to defendant corporation and he should be decreed to do so and it should be further decreed that the 43,000 shares issued to him under the agreement of May 15th, 1933, for bumper and automotive patents be canceled or returned to the corporate *Page 604 
treasury. What I have said heretofore with respect to possible subsequent changes in par value of shares applies to said 43,000 shares.
 5.
It is argued on behalf of Mascuch that he should not be decreed to perform the agreement of November 4th, 1936, by executing and delivering to defendant corporation formal assignments of the patents and patent applications standing in his name as of May 15th, 1933, because the agreement of November 4th, 1936, was a contract superseding the agreement of May 15th, 1933, and that if the latter agreement, whereby he received 43,000 shares of stock is void from its outset, the superseding contract based on the void contract cannot remain in force. If the agreement of May 15th, 1933, dealt with a single matter only, there might be some substance to the argument but it contained two subjects, one a contract of sale whereby I have found that Mascuch resold to defendant corporation the same bumper patents he had sold to it in 1926, for which resale he received 43,000 shares of stock and two, a new employment and license agreement between Mascuch and defendant corporation which canceled a similar agreement made in 1926 and which remained in force and was performed until the agreement of November 4th, 1936, took its place as to compensation and other terms of financial benefit to Mascuch. The bumper patents formed no part of the subject-matter sold under the agreement of November 4th, 1936 and that agreement was based on a new and valuable consideration to Mascuch which was (1) a doubled salary; (2) a bonus on net profits; (3) a right to acquire stock purchase warrants, and therefore it should be enforced as an agreement separate from and independent of the agreement of May 15th, 1933.
 6.
The International Corporation was incorporated October 6th, 1934, for the primary object of acting as a sales distributor for steel. Prior to the institution of this suit Mascuch, *Page 605 
John T. Mascuch and defendant Healy were questioned as to the connection between defendant corporation and International Corporation and they denied knowledge concerning the incorporation of the latter and stated they believed it to be a subsidiary of Republic Steel Co. The facts adduced at the hearing of this cause show that their denial was deliberately false. International Corporation was organized by the corporate defendant's counsel pursuant to directions given him by Mascuch, and defendant corporation paid said counsel $100 on account of incorporation disbursements and also paid $50 as deposit for telephone services for International Corporation. November 16th, 1934, a check of defendant corporation for $10,000 was drawn at Mascuch's order, without authority or knowledge of directors of defendant corporation, and was cashed by Mascuch and the same day a bank account was opened in the name of International Corporation for that amount. The officers of International Corporation were Guy M. Reynolds, president, and Louis J. Campbell, secretary and treasurer, both of whom consented to act as officers at Mascuch's request. Reynolds was a friend of Mascuch's and at the time of incorporation was in the oil burner business and prior thereto had been connected with an automobile school. He testified he had very little money and small credit resources. Campbell was a brother-in-law of John T. Mascuch and does not appear to have had any previous experience in the steel business. Some time after International Corporation was organized Mascuch directed Healy, treasurer of defendant corporation, to charge Mascuch on defendant corporation's books with Mascuch's note for $10,000 for the amount of cash received by Mascuch November 16th, 1934, and September 5th, 1936, he had Reynolds sign a note for $10,000 payable to defendant corporation, which note was later substituted for Mascuch's note and on April 5th, 1938, Mascuch executed a guaranty of payment of Reynolds' note. Three payments, all after this suit had been commenced, for a total of $300, were made by Reynolds on account of his note and the balance of $9,700 is still due thereon. The minute book, stock certificate and transfer books of International Corporation were delivered to Mascuch immediately after that *Page 606 
corporation was formed. After this suit was instituted Campbell, at Mascuch's direction, prepared stock certificates for International Corporation dating them November 21st, 1934. No corporate meetings had been held prior to 1939 and in that year Campbell signed International Corporation's minutes as secretary for the first time. In 1935, 1936 and 1937 most of the sales made by International Corporation were to defendant corporation and in 1937 Mascuch issued an order that all requisitions of defendant corporation for steel must go through International Corporation and not elsewhere, unless International Corporation could not supply defendant corporation's requirements.
I have no doubt that International Corporation was organized and owned by Mascuch for the purpose of securing for himself commissions and profits which might accrue to that corporation through dealings with defendant corporation. He will be decreed to pay defendant corporation the balance of $9,700 of its funds used by him for such organization purposes, with interest from November 16th, 1934, as well as $150 paid by defendant corporation for organization expenses of International Corporation and a suit should be brought against International Corporation and Mascuch for an accounting of all profits made by International Corporation as the result of its business dealings with defendant corporation.
 7.
Mascuch and the other individual defendants are liable for illegal withdrawals of funds of defendant corporation, a great many of which went into Mascuch's pocket. As directors of defendant corporation the individual defendants occupied a fiduciary position toward their stockholders and it was their duty to see that proper and clear records were kept of receipts and disbursements of corporate funds and to take and preserve vouchers for all payments made. The burden of proof to support their claim of propriety for disbursements of corporate funds is on them. (In re Gaston Trust, 35 N.J. Eq. 60; Dufford v.Smith, 46 N.J. Eq. 216; Willis v. Clymer, 66 N.J. Eq. 284;Smith v. Robinson, 83 N.J. Eq. 384; *Page 607 Villa Site Co. v. Copeland, 91 N.J. Eq. 503; Whitfield v.Kern, 120 N.J. Eq. 115; reversed on other grounds, 122 N.J. Eq. 332.)
From 1933 through 1939 large sums of corporate money were paid to Mascuch without any itemization or supporting vouchers, such payments being shown in various accounts entitled "Reserve for Services Rendered and Royalties," "Reserve for Services Rendered," "Reserve for Sales Expense," "Accounts Payable" and finally, after the S.E.C. investigation in 1939, "Due to Officer Joseph J. Mascuch."
It appears from the testimony, especially that of Healy the treasurer of defendant corporation, that whenever Mascuch requested money for expenses he got it merely for the asking and without detailed statement of what particular expense he was about to incur, or itemized statement of expenditures after they were made. Mascuch was the president and "boss" and he was given what he asked without question, in sums sometimes of thousands of dollars and usually in cash, the directors being satisfied to grant his demands so long (as one of them expressed it) as Mascuch was "bringing home the bacon." Mascuch testified that he kept a record of his expenditures in a little black book which he produced and which showed a collection of figures giving totals for each month, without dates or statements for what expended or to whom paid. He would present a requisition in writing for cash money, merely specifying that it was for travel, entertainment and incidentals and such written request was called a voucher, along with the check which was cashed. As two of the many instances of the careless way in which the directors permitted the expenditure of corporate funds on Mascuch's mere request, I would refer to testimony showing that in January, 1933, he received $6,000 in cash which he claimed he had expended in one month for entertainment, hotels, travel, shows, night clubs, liquor and horse races, and in June, 1933, he claimed he had spent $4,600 in cash for the purchase of an automobile which he said he was using in the company's business. There were various and many other large sums which he claimed he had expended in cash for entertainment, some of the entertainment being of a questionable nature, for which he presented *Page 608 
no itemized voucher, on which he was reimbursed by the corporation on his mere request. He could not explain why he personally paid for items which could have been billed direct to his corporation, or why the disbursements he claimed were all made in cash rather than by his own or the defendant corporation's check.
In September, 1937, Mascuch with his wife made a European trip of three months. The defendant corporation paid $1,553.23 for their round trip steamer tickets and other traveling incidentals and furnished him with a letter of credit for $25,000 and travelers' checks amounting to $2,500. Out of the letter of credit he expended $9,000 and he used all the travelers' checks, beside which he claimed to have expended $9,137.55 of his own funds for travel, hotel bills and entertainment for which he sought and received reimbursement from the defendant corporation without itemization of such expenditures or supporting vouchers. It would thus appear that he had at least $10,000 of his own money with him in addition to the liberal funds supplied him by the corporation and the only record he was able to produce to justify his claim that for the benefit of the corporation he expended his own money, rather than available corporation funds, were entries of figures in his little black book. On his unsupported statement, the ninety-day trip abroad taken by Mascuch and his wife cost the defendant corporation over $20,000 besides steamship tickets and some travel incidentals. In addition to the expenditure of $9,137.55 of his own cash money he claims to have made for his corporation, he laid out other money for personal purchases on his own account on which he paid United States custom charges of $500 and subsequently a fine of $500 or $600 dollars on smuggling charges. He claimed to have made the trip solely on behalf of defendant corporation although he was accompanied by his wife in his visits to several European countries, and he testified that he effected improvements in the operation of a British company in which the defendant corporation had an interest and that through his activities several large orders were received by defendant corporation. The testimony of officials of the British company was to the effect that Mascuch told them he *Page 609 
had come to Europe for a holiday and vacation; that he paid a short visit to the British company which produced no benefit to that company and that he procured no orders for that company or for defendant corporation. It is my opinion that Mascuch's European trip was for his own pleasure; that any benefit the defendant corporation derived therefrom was paid for by the corporation by the expenditure of $9,000 from its letter of credit and $2,500 in travelers' checks, and that if Mascuch spent $9,137.55 of his own funds in the course of that trip, it was for his own enjoyment and for purchases made for his own use. Including that sum of $9,137.55 as improperly paid by the corporation to Mascuch, the total amount of corporate funds proven to have been withdrawn by him without itemization or supporting vouchers during the years 1933 to 1939 inclusive for which the individual defendants presented no proof as to the proper expenditure thereof, is $158,990.73 and for such withdrawals the directors are liable.
 8.
After this suit was instituted the directors of defendant corporation caused the expenditure of corporate funds for the purpose of aiding them as individual defendants in making defense to complainants' causes of action; also for the employment of counsel to represent the corporate defendant, although the corporation is only a nominal party and no affirmative relief is sought against it, the suit being for its benefit. Such expenditures were unlawfully made for defense of a suit brought by stockholders for the benefit of their corporation, against directors charged with dereliction of duty which resulted in waste of corporate funds, which charges of dereliction I find have been substantiated. (Solimine v. Hollander, 129 N.J. Eq. 264; Mason v. Pewabic Mining Co., 66 Fed. Rep. 391; McCourt v.Singers-Bigger, 145 Fed. Rep. 103; Monahan v. Kenny,288 N YS. 323; Jesse v. Four-Wheel Drive Auto Co., 177 Wis. 627;Griese v. Lang, 37 Ohio App. 553; Godley v. Crandall andGodley Co., 168 N.Y.S. 251; Kirby v. Schenck,25 N.Y.S. 2d 431.)
One Joseph Coons was retained by Mascuch to investigate *Page 610 
the complainants and in March, 1939, the corporation paid him $10,000. No proof was presented by the defendants that Coons performed any other services which would justify the payment of that sum by defendant corporation. For similar services he was also paid by the corporation between December, 1938, and May 1st, 1939, various sums aggregating $930.40 and he has a suit pending against Mascuch and defendant corporation wherein he seeks to recover the further sum of $10,000 for services rendered.
A suit was brought in the United States District Court for the Eastern District of Pennsylvania in the name of the defendant corporation against the complainants in the instant suit, or some of them, charging those complainants with having fraudulently conspired to oust the individual defendants from the management of defendant corporation, and $2,500 of the funds of defendant corporation was paid to Bernard J. Kelley, a Philadelphia attorney, for instituting that suit. I think the purpose of that suit was to harass Pennsylvania stockholders who had acquired their stock prior to the underwriter's stock sale and to force them out of the instant suit. In fact Mascuch wrote the Philadelphia attorney to "high light" them to make them realize the danger of their position as complainants so that they might withdraw as complainants herein. Proceedings in the Pennsylvania suit were restrained by an order entered in the instant suit on consent of counsel for all defendants.
The late Merritt Lane was retained as solicitor and counsel in the instant suit for defendant corporation and received a total fee of $10,000. After his death Messrs. Breslin Breslin were substituted in his stead. The general counsel for defendant corporation was Courtland Palmer of the New York bar and through him Harry Green was retained as solicitor and counsel for the individual defendants herein and is still acting for them. On account of a bill for $25,000 rendered by Mr. Palmer to defendant corporation for services in the instant suit, he was paid $7,500 out of which he paid Mr. Green $5,000, and in addition to that payment Mr. Green has received $7,750 from defendant corporation for services rendered the individual defendants. *Page 611 
There was proof of various other payments of funds of defendant corporation to counsel and others for services rendered in connection with the S.E.C. investigation and defendant corporation's income tax settlement, which services complainants contend were performed for the benefit of the individual defendants and more particularly for Mascuch, but I do not consider the proof entirely conclusive to support the complainants' contention that such payments were improperly made, but I do find that the individual defendants should be decreed to return to defendant corporation the following sums paid as heretofore stated, in aid of the individual defendants' defense to this suit: $10,930.40 paid to Joseph Coons with interest from March 24th, 1939; $2,500 paid to Bernard J. Kelley with interest from October 14th, 1938; $7,500 paid to Courtland Palmer with interest from June 10th, 1939; $7,750 paid to Harry Green with interest from January 1st, 1940.
 9.
Various other charges of waste of corporate funds, mismanagement and dereliction in duty have been directed against the individual defendants, some of which find considerable support in the evidence. I do not detail them in this already long opinion because I believe that the foregoing findings are ample and conclusive evidence that the business and affairs of defendant corporation have been grossly mismanaged by the individual defendants, and particularly by Mascuch, for their personal benefit in wanton disregard of the rights of corporate stockholders, ever since the incorporation of defendant in 1926. Mascuch ran the corporation, the other individual defendants being his willing servants who acquiesced supinely in whatever he ordered or did, permitting him to use the corporation for his private gain. They are unworthy to be continued in control and management of defendant corporation, especially Mascuch who robbed the corporation and because of his conviction of perjury and sentence to prison is unfitted to act as a director and corporate president. It is contrary to business morals and judicial *Page 612 
policy that the individual defendants should be permitted to control directly or indirectly the management of defendant corporation. (Avery v. Blees Manufacturing Co., 27 N.J. Eq. 412; Fitzgerald v. State Mutual Building and Loan Association,74 N.J. Eq. 440; Morse v. Metropolitan Steamship Co., 87 N.J. Eq. 217;
modified on appeal on other grounds, 88 N.J. Eq. 325;Shuster v. Ventnor Gardens, 103 N.J. Eq. 93; Atlas Fence Co.
v. West Ridgelawn Cemetery, 110 N.J. Eq. 580.)
Although it is shown that the business of the defendant corporation has been conducted in a manner greatly prejudicial to the interest of its stockholders, it has not been shown that the corporation is insolvent or that its business has been and is being conducted at a great loss, and therefore this court is without authority to appoint a statutory receiver or to remove its present board of directors, but it has authority under its general equity powers to appoint a receiver to take over control and management of corporate property when conditions exist calling for such action for the protection of stockholders' rights, and thus temporarily suspend corporate management by corporate officers who have been found guilty of malfeasance. (Einstein v. Rosenfeld, 38 N.J. Eq. 309; Benedict v.Columbus Construction Co., 49 N.J. Eq. 23; Edison v. EdisonUnited Phonograph Co., 52 N.J. Eq. 620; Sternberg v. Wolff,56 N.J. Eq. 389; In re New Jersey Refrigerating Co., 95 N.J. Eq. 215.) Therefore I shall appoint a receiver to take over control and management of the property and business of defendant corporation until such time as it shall appear on petition by duly elected directors of defendant corporation presented in the name of their corporation, that such directors have been chosen by the corporate stockholders as independent persons to whom the stockholders desire to commit the future management of their corporation. *Page 613